IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | |
| | : | CHAPTER 12 |
| THOMAS H. McELWEE, JR. | : | |
| BECKY S. McELWEE | : | CASE NO. 1-10-bk-02566 RNO |
| | : | |
| Debtors | : | |

**************************************************************************

| | |
|---|---|
| THOMAS H. McELWEE, JR. | : |
| BECKY S. McELWEE | : |
| | : |
| Movants | : |
| | : |
| v. | : |
| | : |
| ADAMS COUNTY NATIONAL BANK, | : |
| AgCHOICE FARM CREDIT, SCARFF | : |
| BROTHERS, INC., MOUNTAIN VIEW | : |
| VETERINARY SERVICES, INTERNAL | : |
| REVENUE SERVICE, PENNSYLVANIA | : |
| DEPARTMENT OF REVENUE, | : |
| FRANKLIN COUNTY TAX CLAIM | : |
| BUREAU, and CUMBERLAND | : |
| COUNTY TAX CLAIM BUREAU | : |
| | : |
| Respondents | : |

# **OPINION**[1]

The Chapter 12 Debtors/Movants filed a Motion under F.R.B.P. 3012 to value their secured creditors' real estate collateral. This Opinion determines the value of the Debtors' three pieces of real estate. This will allow determination of the secured status of the respective claims against the real properties.

**I.     Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and § 157(b)(2).

---

[1]     Drafted with the assistance of Ryan B. White, Esquire, Law Clerk.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

**II.    Facts**

Thomas H. McElwee, Jr. and Becky S. McElwee, his wife, family farmers, ("Debtors") filed a Voluntary Chapter 12 Petition on March 30, 2010.

On the petition date, the Debtors owned three pieces of real property. The properties are generally known as: 2807 Wayne Road, Chambersburg, Pennsylvania ("Wayne Road Property"); 250 Jumper Road, Newburg, Pennsylvania ("Jumper Road Property"); and, 653 Big Spring Road, Newville, Pennsylvania ("Big Spring Road Property").

The Debtors filed their Original Chapter 12 Plan ("Original Plan") on June 25, 2010, at Docket No. 33. Several objections were filed to the Original Plan and on December 7, 2010, an Amended Chapter 12 Plan ("Amended Plan") was filed at Docket No. 82. Objections to confirmation of the Amended Plan were filed by Scarff Brothers, Inc. ("Scraff Brothers"), Mountain View Veterinary Services ("Mountain View"), and AgChoice Farm Credit ACA ("AgChoice").

As noted above, prior to filing the Amended Plan, on October 13, 2010, the Debtors filed a Motion under Rule 3012 to determine the value of the collateral securing at least a portion of the Respondents' claims against the Debtors' real property ("3012 Motion"). The 3012 Motion names eight Respondents. The 3012 Motion was filed to Docket No. 57.

Expert testimony was heard from three real estate appraisers concerning the value of the Wayne Road Property. Two appraisers testified concerning the value of the Jumper Road Property, and the Big Spring Road Property. The evidentiary hearing on the 3012 Motion commenced on January 13, 2011. Appearances were made by the Debtors, Scarff Brothers and

AgChoice. At the hearing, the parties stipulated to three matters concerning the 3012 Motion: (1) it was agreed that a document marked as Exhibit A accurately set forth the lien priorities against the Debtors' real properties; (2) that there was no substantive change in the condition of the improvements on the Debtors' real properties between the dates on which the parties' respective appraisers conducted their valuations; and, (3) that each of the properties had been used only for farming and/or residential purposes.

The 3012 Motion is now ripe for decision.

### III. Discussion

#### A. Method of Valuation

A seminal case on bankruptcy valuations is the United States Supreme Court's decision in *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879 (1997). *Rash* concerned a creditor's objection to the confirmation of the debtor's Chapter 13 plan. The plan provided for retention of the collateral, a tractor truck, and a "cram down" of the truck's value to $28,500.00. The creditor's objection maintained, in part, that its claim was secured in the amount of $41,171.00. 11 U.S.C. § 506(a)(1)[2] provides, in part:

> (a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property . . .

The Supreme Court in *Rash* noted that the United States Courts of Appeal had previously

---

[2] Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37 ("BAPCPA").

3

taken different approaches for valuing secured claims in a cram down context. Such approaches included foreclosure value standards and replacement value standards. The Supreme Court noted that under § 506(a), the proposed disposition or use of the collateral is of "paramount importance" to the valuation question. *Rash*, *supra*, at 962. In *Rash*, the Supreme Court concluded that, where the debtor retains the collateral, the replacement value standard is the appropriate measure of value. It held that in a Chapter 13 context the replacement value: " . . . is the cost the debtor would incur to obtain a like asset for the same 'proposed . . . use' ". *Rash*, *supra*, at 965. The Supreme Court also noted that the Bankruptcy Court, as the trier of fact, could identify the best way of ascertaining replacement value on the basis of the evidence presented. *Rash*, *supra*, FN 6. I recognize that *Rash* was decided in a Chapter 13 context while the case at bar is Chapter 12 family farmer proceeding.

I note that other Chapter 12 cases, decided both before and after *Rash*, have utilized many of the same factors in determining the value of a creditor's collateral. *In re Brace*, 163 B.R. 274 (Bankr. W.D.Pa. 1994) considered a Chapter 12 debtor's motion for determination of secured status. The Farmers Home Administration filed a proof of claim asserting a secured claim in the amount of $707,195.73. The Bankruptcy Court found the following with respect to the correct approach to value "we are persuaded that the Debtors' current and prospective use is the correct basis for the appraisal in determining the amount of the lender's secured claim". *In re Brace*, *supra*, at 277 (internal citations omitted). I find this language to be markedly similar to some of the language used by the Supreme Court in *Rash*.

Another earlier Chapter 12 case which adopted a *Rash* approach to value is *In re Watkins*, 240 B.R. 735 (Bankr. C.D.Ill. 1999). The court found that the proper method for valuing

4

property which a Chapter 12 debtor will retain must consider the debtor's current and prospective use of the real estate. It found that the debtor's intended use – as a full time family farm – was the correct basis for an appraisal to determine the amount of a secured creditor's claim. The court cited *Rash* in applying the replacement value method in valuing the property. The court found "replacement value is equivalent to fair market value, or the value a willing purchaser in the debtor's business would pay for a like property". *Watkins*, *supra*, at 741. Ultimately, the court in *Watkins* denied the creditor's motion to reconsider the valuation of its collateral.

A later Chapter 12 case which considered a § 506(a) motion to value collateral is *In re Bishop*, 339 B.R. 595 (Bankr. D.S.C. 2005). The debtor owned approximately 33 acres improved with two poultry houses, two metal sheds, eight grain bins and a framed hog barn. The debtor's mobile home was also located on the property. The real estate was secured by a mortgage in favor of the United States Department of Agriculture. The debtor argued that valuation of the collateral should be based upon his proposed disposition or use of the property while the secured creditor contended that the highest and best use of the property – conversion into a broiler farm – should be considered. The court in *Bishop* concluded proper valuation must consider the actual use proposed by the debtor. *Bishop*, *supra*, at 600.

I believe that the intended use approach to valuation – giving due consideration to the Debtors' intended use – finds additional support in the case law in this District. The United States District Court considered a bankruptcy appeal in *In re Donato*, 253 B.R. 151 (M.D.Pa. 2000). The United States Internal Revenue Service had appealed the Bankruptcy Court's § 506 determination of its secured status. In the trial before the Bankruptcy Court, the debtor's expert

5

valued the debtor's 14-acre parcel at $186,000.00 based upon the Chapter 13 debtor's proposed use of the property. The appellant, the Internal Revenue Service, argued that its expert's valuation of $926,000.00 should have been applied. The Internal Revenue Service's appraiser's valuation was based upon the property's "highest and best use"; in this case, the appellant argued, a residential subdivision. The District Court affirmed the Bankruptcy Court, which had valued the entire 14-acre parcel rather than the attendant value of 28 subdivided lots.

Therefore, in the case at bar, I will take a two-step approach with respect to the valuation of each of the Debtors' three properties. First, I will attempt to discern the Debtors' proposed disposition of each property under the Amended Plan. Second, I will consider the evidence to determine the applicable value of the Debtors' properties. In evaluating the Debtors' properties, and assessing the appraisal testimony, I draw significant guidance from two Bankruptcy Court decisions, *In re Abruzzo*, 249 B.R. 78 (Bankr. E.D.Pa. 2000); and, *In re Serda*, 395 B.R. 450 (Bankr. E.D.Cal. 2008).

I note that nothing in this Opinion should be read to imply whether or not the Debtors' Amended Plan can be confirmed.

### B. Valuation of Wayne Road Property

Three real estate appraisers testified concerning the value of the Wayne Road Property. The Debtors' appraiser, Thomas R. Donahue, testified first.

Mr. Donahue is a Pennsylvania state certified general appraiser. He also held a real estate broker's license from approximately 1964 to 1998.

Mr. Donahue testified that he essentially used the comparable sales approach in evaluating the Wayne Road Property. He testified that he developed a cost approach but did not

6

Case 1:10-bk-02566-RNO   Doc 118   Filed 06/06/11   Entered 06/06/11 13:11:26   Desc
Main Document    Page 6 of 18

give it much consideration or weight and that he did not develop an income approach. His appraisal report includes three comparable sales with the sales dates ranging from September, 2008, to April, 2010.

Mr. Donahue's report provides a general description of the Wayne Road Property. The subject property is a 7.49 acre tract, improved with a two-story brick dwelling and six other buildings, including a two-car concrete block garage, an A-frame barn, and structures which were originally built for poultry housing use.

Mr. Donahue testified that, in his opinion, the fair market value of the Wayne Road Property was $350,000.00 as of June 28, 2010.

I would note that I was somewhat disappointed by Mr. Donahue's appraisal report. The format of the report does not allow for an easy comparison between the subject Wayne Road Property and the comparable sales which are reported. It has been my experience that it is somewhat customary for appraisal reports to contain a grid which allows for a side-by-side comparison of certain attributes of the subject property with each of the comparable sales. Mr. Donahue's report lacks such a grid. I was also surprised that Mr. Donahue's appraisal report does not contain photographs of the improvements on the three comparable sale properties. Also, a total of three sales is a rather narrow basis for a fair market value opinion concerning the Wayne Road Property.

AgChoice called Mr. David Coletta to testify concerning the valuation of the Wayne Road Property. Mr. Coletta is a state certified residential appraiser. Mr. Coletta testified that he, along with John D. Ausherman in his office, prepared a report of their valuation of the Wayne Road Property.

7

Case 1:10-bk-02566-RNO    Doc 118    Filed 06/06/11    Entered 06/06/11 13:11:26    Desc
Main Document    Page 7 of 18

Significantly, Mr. Coletta's appraisal report indicates on page 3: "The purpose of this appraisal is to estimate the market value of the subject property's liquidation value, as of December 21, 2010." At the hearing, the Debtors lodged a "general objection" to Mr. Coletta's testimony on the basis that he was testifying as to liquidation value as opposed to fair market value.

It bears repeating that the proposed disposition or use of the collateral is pivotal in determining the correct approach to valuation. Here, the Wayne Road Property had been used in the Debtors' farming operations. In this case, the Debtors' Amended Plan provides for alternate treatment of the Wayne Road Property. That is, Part III.A. of the Amended Plan provides, in part:

> . . . A. Debtors shall transfer, in kind, the Wayne Road real estate to AgChoice, free and clear of all liens, if, **but only if, the Court determines the value of this real estate at or above Three Hundred Thousand ($300,000.00) Dollars, for this purpose** . . .

Debtors' Am. Plan 11. (Emphasis added).

Alternatively, Part III.B. of the Amended Plan provides, in part:

> . . . B. In the event the Court determines the transfer value of Wayne Road is less than Three Hundred Thousand ($300,000.00) Dollars, . . . **then Debtors will continue their efforts to sell this real estate**.

Debtors' Am. Plan 11-12. (Emphasis added).

Due to the alternate dispositions of the Wayne Road Property provided for in the Amended Plan, I overruled the Debtors' "general objection" to Mr. Coletta's opinion concerning the liquidation value of the Wayne Road Property. This is because different dispositions of the collateral require different valuation methods. Generally, when the collateral is surrendered to a

8

Case 1:10-bk-02566-RNO    Doc 118    Filed 06/06/11    Entered 06/06/11 13:11:26    Desc
Main Document    Page 8 of 18

secured creditor, like AgChoice, a liquidation value, also referred to as a foreclosure value – rather than fair market value, is utilized.  For example, the Bankruptcy Court for the Western District of Missouri considered a secured creditor's objections to a Chapter 13 debtor's proposed confirmation modification of her Chapter 13 plan.  The Court noted "[t]he appropriate measure of valuation for collateral to be surrendered would be liquidation value at the time of surrender". *In re Hutchison*, _____ B.R. _____, 2011 WL 477821, *4 (Bankr. W.D.Mo. 2011).  Also see, *In re Barclay*, 276 B.R. 276, 280 (Bankr. N.D.Ala. 2001); *In re Price*, 366 B.R. 389, 396 (Bankr. M.D.Pa. 2007).

I again stress that I am expressing no opinion as to whether or not the Amended Plan can be confirmed.  However, in light of the Debtors' alternative proposed dispositions of the Wayne Road Property, I find it is appropriate that I make findings as to both the liquidation and the fair market values of the Wayne Road Property.

Mr. Coletta's own testimony highlights some distinctions between the two approaches to value.  He testified:

> The two key points that are different with liquidation value than
> market value are reasonable exposure and undue duress.  The
> property, with it being a liquidation value, isn't going to be
> exposed to the market as long as these other sales have been –
> you're looking at a quick sale, trying to get rid of something that's
> under distress or duress.

Trial Tr. vol. 1, 61, January 13, 2011.

Mr. Coletta testified that he considered utilizing the cost and income approaches to valuation of the Wayne Road Property, but ultimately rejected such approaches.  Like Mr. Donahue, Mr. Coletta utilized the comparable sales method.  His appraisal report includes three comparable sales with the sales dates ranging from November, 2009, through November, 2010.

9

Page 37 of Mr. Coletta's appraisal report indicates that three additional sales, which sold between March, 2009, and September, 2009, were also considered as part of the comparable sales approach.

Mr. Coletta's reports, like Mr. Donahue's, does not contain photographs of the improvements on the comparable sale properties. Page 35 of Mr. Coletta's report does contain a grid for side-by-side comparison of certain aspects of the Wayne Road Property with the three comparables. The grid, for example, shows the distance of the comparables from the Wayne Road Property. The text of Mr. Donahue's appraisal report shows the approximate distance from Wayne Road for comparable sales one and two but not for comparable number three.

Consistent with a liquidation approach to value, the three comparable sales initially considered in Mr. Coletta's report show relatively few days on the market. The days on the market reported are: for comparable sale number (1) - twenty-five days; comparable sale number (2) - four days; and, comparable sale number (3) - six days. Unfortunately, I am unable to discern from Mr. Donahue's report the days on the market for the comparable sales which he considered. Generally, Mr. Coletta's comparable sales were somewhat more recent in time than Mr. Donahue's but I appreciate that adjustments were made by each expert witness at arriving at their final valuation opinions. Mr. Coletta ultimately opined that the liquidation value of the Wayne Road Property, as of December 21, 2010, was $220,000.00.

Don Paul Shearer, called by Scarff Brothers, testified concerning his opinion of the value of the Wayne Road Property.

Mr. Shearer testified that he was not given access to the interior of the property but that he did a "peek-a-boo through the window inspection of the interior". Trial Tr. vol. 1, 34,

January 13, 2011. He also indicated that he took exterior measurements, spoke with the listing realtor, and consulted the tax assessment records for Franklin County. Like Mr. Donahue, Mr. Shearer solely used the sales comparison approach to value concerning the Wayne Road Property.

Mr. Shearer testified that he had great difficulty locating any sales from 2007 to 2010 that he felt were really comparable to the subject property. His appraisal report, which gives an opinion of value as of September 14, 2010, contained four comparable sales. Page 25 of the appraisal report contains a qualitative grid with the comparable sales and the subject property as well as a quantitative grid of the sales comparisons. Essentially, Mr. Shearer calculated the value or price per acre among the comparable sales and the subject property.

Three of the four comparable sales Mr. Shearer considered occurred in 2006; the most recent comparable sale he considered, comparable sale number (2), indicates a sale date of August, 2008. I note that, generally, Mr. Shearer's comparable sales lack the recency of the comparable sales considered by Messrs. Donahue and Coletta.

Mr. Shearer's appraisal report does contain photographs of the major improvements on the four comparable sales addressed in the report. Photos of the exterior of the Wayne Road Property are also provided in the report. As noted above, the Wayne Road Property contains 7.49 acres. The comparable sales considered by Mr. Shearer ranged in size from 2 acres to 16 acres. Further, the "price/acre improved" recorded on page 25 of his report ranges from a low of $19,375.00 to a high of $147,500.00 per acre. Mr. Shearer testified that he made upward adjustments in the subject property because of its location and its "superior utility". Trial Tr. vol. 1, 43, January 13, 2011. I note that in his testimony, Mr. Shearer outlined what he believed

11

to be allowable zoning uses for the Wayne Road Property. His testimony appeared to concentrate on his perception of the "highest and best use" for the Wayne Road Property rather than the Debtors' intended use. He testified ". . . probably the biggest difference in our opinion was just I thought the highest and best use was more heavily towards that type of a semi commercial use." Trial Tr. vol. 1, 37, January 13, 2011.

Mr. Shearer ultimately opined that the fair market value of the Wayne Road Property, as of September 14, 2010, was $400,000.00. I will ascribe less weight to Mr. Shearer's opinion of value than I do to the opinions of Messrs. Donahue and Coletta. I do so principally because of Mr. Shearer's "highest and best use" approach to value and the relative weakness of the comparable sales he considered in arriving at his opinion of value.

Based upon the record presented, I find that the liquidation value of the Wayne Road Property, if surrendered to a secured creditor, is $239,680.00. I further find that the fair market value of the Wayne Road Property, if retained by the Debtors, is $299,600.00.

### C. Valuation of Jumper Road Property

I next consider the valuation of the Jumper Road Property. The property contains 28.43 acres; it is improved with the Debtors' two-story residence as well as a bank barn, several livestock buildings, and sheds which are used in the Debtors' farming operations. Since the Debtors' Amended Plan contemplates retention of the Jumper Road Property, with a continuation of the same uses, I find it is appropriate to determine the fair market value of the subject property. It has been held that the fair market value is: ". . . the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time". *In re Serda*, 395

12

Case 1:10-bk-02566-RNO    Doc 118    Filed 06/06/11    Entered 06/06/11 13:11:26    Desc
Main Document    Page 12 of 18

B.R. 450, 453-454 (Bankr. E.D.Cal. 2008).

Two real estate appraisers testified concerning the value of the Jumper Road Property.

Mr. Thomas R. Donahue was again called as the Debtor's appraiser. Mr. Donahue testified that he relied most heavily on the comparable sales approach to valuation of the Jumper Road Property. The appraisal report includes three comparable sales, with the dates of sale ranging from August, 2008, to April, 2010. Comparable sales ranged in size from 18.71 acres to 52.99 acres. Again, the subject Jumper Road Property contains 28.43 acres.

Mr. Donahue's appraisal report for the Jumper Road Property does not contain a grid allowing for easy comparison between the subject Jumper Road Property and the comparable sales which he considered. Also, while the report contains some photographs of the improvements on the Jumper Road Property, it does not contain any photographs of the improvements on the comparable sales which were considered. Mr. Donahue did testify that he made adjustments between the subject property and the comparable sales and that his work papers were available for inspection when he testified.

Mr. Donahue's written report states a fair market value of the Jumper Road Property, as of July 14, 2010, in the amount of $395,000.00. However, a portion of his testimony appears to indicate a slightly different opinion of value. On direct testimony, he testified ". . . – I multiplied the 28.43 acres by an indicated per acre value of $13,500, resulting in a rounded value of $384,000.00 for the property". Trial Tr. vol. 1, 128, January 13, 2011. I note that 28.43 multiplied by $13,500.00 equals $383,805.00. It is also noted that page 25 of Mr. Donahue's appraisal report for the Jumper Road Property indicates a value by sales comparison approach of $384,000.00.

13

Mr. Don Paul Shearer was called by Scarff Brothers concerning his opinion of the fair market value of the Jumper Road Property.

Mr. Shearer, like Mr. Donahue, indicated that he preferred the comparable sales approach to valuation of the subject property. Mr. Shearer's appraisal report included eight comparable sales with the sales dates ranging from March, 2006, to June, 2010. The comparable sales ranged in size from 17.86 to 60.57 acres – again, compared to the subject Jumper Road Property which contains 28.43 acres.

Mr. Shearer's appraisal report includes photographs of the improvements on the comparable sales. I appreciate the inclusion of those photographs which allow for an easier side-by-side comparison between the improvements on the subject property and the improvements on the comparable sale properties.

Page 29 of Mr. Shearer's appraisal report for the Jumper Road Property contains a "Grid of Improved Sales Data". It presents in columns the following: each comparable sale, including, the location; the sales price; the sale date; the site size; and, the price per acre received. The grid also includes the range of sales prices for the comparable sales and the range of sales dates, land areas, and prices per acre (as improved) received.

Mr. Shearer testified that, in his opinion, the Jumper Road Property had a fair market value, as of September 14, 2010, in the amount of $500,000.00. This is consistent with the opinion of value stated in his appraisal report dated September 16, 2010.

The quality and condition of the improvements on the Jumper Road Property, particularly the Debtors' residence, leave me to conclude that the fair market value of the site is toward the higher range of the comparables which were considered by Messrs. Donahue and Shearer.

14

I conclude that the fair market value of the Jumper Road Property is $475,000.00.

D. **Valuation of Big Spring Road Property**

The Debtors' appraiser, Thomas R. Donahue, and Scarff Brothers' appraiser, Don Paul Shearer, testified concerning the fair market value of the Big Spring Road Property.

The subject property contains 104.24 acres and is improved with an older two-story farmhouse, a bank barn, a silo, and other out buildings and sheds. The Big Spring Road Property is used in the Debtors' farming operations, and it will generally be retained by the Debtors under the provisions of the Amended Plan. It should be noted that there is an approved seven lot subdivision on the property. The Amended Plan, in Section VI.D., page 17, provides that the Debtors may sell one or more of these lots. Therefore, I find it is appropriate to determine the fair market value of the Big Spring Road Property.

Mr. Donahue testified that, in his opinion, the old farmhouse of the Big Spring Road Property could not presently be occupied. He testified "[t]here's a lot of settlement on the left side of the building, it's probably – it's probably settled about four to six inches, it's tilted, and the – you could walk across the floor. If you spilled water on the floor, I'm sure it'd run to that side, and the condition is – overall condition is poor. And probably – possibly should be removed, torn down." Trial Tr. vol. 1, 99, January 13, 2011.

Mr. Donahue's appraisal report for the Big Spring Road Property contains three comparable sales. The sales dates range from February, 2007, through September, 2009, and the acreages of the sales range from 105.66 acres to 114.93 acres. Again, the subject Big Spring Road Property contains 104.24 acres. Mr. Donahue's testimony concerning his appraisal of the Big Spring Road Property was rather truncated. It appears that he again relied most heavily on

15

Case 1:10-bk-02566-RNO    Doc 118    Filed 06/06/11    Entered 06/06/11 13:11:26    Desc
Main Document      Page 15 of 18

the comparable sales approach to value. Once again, his appraisal report does not contain any photographs of the improvements on the comparable sale properties. Mr. Donahue did testify that the buildings on the comparable sale properties were generally superior to the buildings on the Big Spring Road Property.

On cross-examination, Mr. Donahue was asked about the above referenced seven lot subdivision on the Big Spring Road Property. He testified, "I think the best lots have been sold off." Further, he added, [t]here's no demand for the building lots at this particular time." Trial Tr. vol. 1, 105 January 13, 2011. Based upon this, Mr. Donahue opined that no present valuation adjustment was required because of the approved subdivision.

Mr. Donahue's appraisal report for the Big Spring Road Property does not contain a grid allowing for a side-by-side comparison of the comparable sales he considered. Mr. Donahue's appraisal report expresses an "as is" market value as of July 14, 2010, in the amount of $670,000.00. A portion of his testimony reads "[a]nd the final estimate of value of $6,400 per acre, multiplying that times the 104.24 acres . . . results in a value – rounded value of $667,000, that's the indicated value by the comparable sales approach." Trial Tr. vol. 1, 101 January 13, 2011. It is noted that 104.24 times $6,400.00 equals $667,136.00.

Mr. Shearer also testified concerning his opinion of the current market value of the Big Spring Road Property. Mr. Shearer's appraisal report reflects consideration of six comparable sales. The sales dates range from June, 2006, to November, 2009, and the land areas range from 79.79 acres to 143 acres; again, the subject Big Spring Road Property contains 104.24 acres. Mr. Shearer's appraisal report contains photographs of the improvements on the comparable sales property. Also, page 30 of his appraisal report is headed "Grid of Improved Sales Data".

16

Similar to his other reports, this provides the same summary data for the comparable sales considered by Mr. Shearer.

Mr. Shearer testified he considered the seven lot subdivision in arriving at his opinion of value. He testified that he agreed with Mr. Donahue's position and that he did not think that a developer would develop the lots right now. Nevertheless, Mr. Shearer did make an upward value adjustment recognizing some value from the money spent for surveying and for pursuing the subdivision approval process. He testified, "in my opinion, that's worth something." Trial Tr. Vol. 1, 111 January 13, 2011.

Mr. Shearer's appraisal report for the Big Spring Road Property states his opinion that the market value of the property, as of September 14, 2010, was $780,000.00.

I find that the fair market value of the Big Spring Road Property is $725,000.00.

### IV. Conclusion

Section 506(a) of the Bankruptcy Code provides that an allowed claim is a secured claim to the extent of the value of the collateral secured by the lien, and an unsecured claim to the extent the value of the collateral is less than the allowed amount of the claim. *In re McDonald*, 205 F.3d 606, 609 (3d. Cir. 2000); *cert denied*, 121 S.Ct. 66 (U.S. 2000); *In re Baker*, 300 B.R. 639, 643 (Bankr. W.D.Pa. 2003); *In re Cook*, 432 B.R. 519, 522 (Bankr. D.N.J. 2010).

The values that I have determined for the Wayne Road Property, the Jumper Road Property, and the Big Spring Road Property may be utilized to determine the extent to which the allowed claims are secured by the properties. As noted in Section II above, by stipulation, the parties labeled as Exhibit "A" a document purporting to set forth the lien priorities against the Debtors' three real properties.

17

Case 1:10-bk-02566-RNO    Doc 118    Filed 06/06/11    Entered 06/06/11 13:11:26    Desc
Main Document    Page 17 of 18

The allowability and amount of certain claims may still have to be determined pursuant to the provisions of § 502. For example, the Debtors' have outstanding objections to Proofs of Claim 7, 8, and 9, filed by AgChoice; as well as an objection to Proof of Claim 11 filed by Scarff Brothers.

An Order will be entered consistent with the foregoing Opinion.

By the Court,

Date: June 6, 2011

Robert N. Opel, II, Bankruptcy Judge
(BI)