IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | |
| | : | CHAPTER 12 |
| THOMAS H. McELWEE, JR. and | : | |
| BECKY S. McELWEE | : | CASE NO. 1-10-bk-02566 RNO |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| THOMAS H. McELWEE, JR. and | : | |
| BECKY S. McELWEE | : | |
| | : | |
| Objectant | : | |
| | : | |
| v. | : | |
| | : | |
| SCARFF BROTHERS, INC. | : | |
| | : | |
| Claimant | : | |

# OPINION[1]

This matter concerns claims litigation in the above Chapter 12 case. Scarff Bros., Inc. filed an Amended Proof of Claim in the amount of $878,249.11. The Debtors objected to the Proof of Claim on several bases. For the reasons stated below, I will overrule the claim objections and allow the amended claim as filed.

## I.      JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B) and (C).

## II.     FACTS

Thomas H. McElwee, Jr. and Becky S. McElwee, his wife, family farmers ("Debtors"), filed a voluntary Chapter 12 petition on March 30, 2010. On July 9, 2010, Scarff Bros., Inc. filed Proof of Claim Number 11, the claim asserts a secured claim in the amount of $878,249.11.

---

[1]      Drafted with the assistance of Ryan B. White, Esquire, Law Clerk.

The Original Proof of Claim Number 11-1 consists of the one-page Official Form B10 and a one-page exhibit which is a numerical itemization of the amounts claimed. On July 9, 2010, Scarff Bros., Inc. filed an Amended Proof of Claim to Claim Number 11-2. The Amended Claim consists of the Official Form B10 and it continues to assert a secured claim in the amount of $878,249.11. The Amended Proof of Claim differs from the Original Claim only with respect to its attachments. The Amended Proof of Claim includes seven exhibits; in addition to the claim itemization, the Amended Claim attaches certain loan documents between the Debtors and Scarff Bros., Inc. The Amended Proof of Claim is hereinafter referred to as "Claim 11-2".

The Debtors objected to Claim 11-2 on October 21, 2010 ("Claim Objection"). The Claim Objection interposes several objections including objections to the amount of Claim 11-2, the default interest rate, and the extent to which the claim is a secured claim. Finally, the Claim Objection contains an eleventh paragraph which states:

> Debtors are entitled to a setoff, or, alternatively, hold a counterclaim against Scarff Brothers, for any sums remaining due and owing Scarff Brothers (after application of all credits to which Debtors are due), because of the aforesaid defaults by this Claimant. The amount of this setoff, or counterclaim, is presently being calculated by Debtors, and that information will be available at a subsequent hearing to adjudicate these objections. Debtors will advise counsel for Scarff Brothers of the amount of the setoff or counterclaim due Debtors as soon as that information is available.

Three days of testimony were taken regarding the Claim Objection. Briefs were filed by Scarff Bros., Inc. ("Claimant") in support of Claim 11-2 and by the Debtors in support of the Claim Objection, respectively.

The hearing record shows that the Debtors have been farming since 1985. In that year, they purchased a 28.43-acre parcel which is improved, in part, with the Debtors' residence

2

("Jumper Road Property"). In 1999, the Debtors purchased 104.24 acres, which property is improved with an older two-story farmhouse, a barn, and other outbuildings ("Big Spring Road Property"). In 2003, the Debtors purchased a 7.49-acre parcel, improved with a brick dwelling, a barn, garage, and other outbuildings ("Wayne Road Property"). Much of the Debtors' farming operations has been devoted to the purchase and sale of beef cattle. Mr. McElwee testified that he has purchased and sold beef cattle since 1980. The Debtors' farming operation has included buying cattle from others, raising cattle for others, and raising cattle for their farm.

The Debtors' method of cattle raising has changed over the course of time. Prior to 2003, the Debtors generally purchased a cow weighing 300 to 400 pounds, raised it, and sold it when its weight reached the 1,200- to 1,400-pound range. Purchasers from the Debtors during that period of time were packing houses which slaughtered the cattle for their meat. The Debtors also operated a "receiving station". They took possession of other farmers' calves at the receiving station and transported them to purchasers on a commission basis.

In 2003, the Debtors began business dealings with the Claimant. Their business dealings continued and evolved over the course of several years. Part of the business relationship included the Claimant making a series of loans to the Debtors. The loans were evidenced by promissory notes in the following amounts: (1) a note dated July 31, 2003, in the face amount of $200,000.00; (2) a note dated November 24, 2003, in the face amount of $300,000.00; (3) a note dated June 11, 2004, in the face amount of $500,000.00; and, (4) a note dated March 11, 2005, in the face amount of $750,000.00. The last three Notes were refinancings of the earlier obligations. For example, the $300,000.00 Note refinanced the outstanding balance on the $200,000.00 Note and made the difference available to the Debtors as new money. As noted above, Claim 11-2 is

3

in the amount of $878,249.11.  The Debtors used a portion of the loan proceeds obtained from the Claimant to remodel an existing barn into the wet barn and to construct a new feeder barn on the Jumper Road Property.

No comprehensive agreement which spelled out the business arrangements between the Debtors and the Claimant was introduced into evidence.  I do note that, absent a written agreement with specified terms, it is more difficult for a court to discern the parties' intentions and to give effect to such intentions.

I find that there were two essential relationships between the Debtors and the Claimant. First, the Debtors borrowed money under a loan facility pursuant to the terms of the promissory notes and other loan documents.  Second, the parties entered into several contracts concerning the raising of calves.

Beginning in 2003, the Debtors would purchase one- or two-day old calves which would generally each weigh 80 to 100 pounds ("New Calves").  New Calves were originally raised by the Debtors in a "wet barn" on their property where they were fed a milk diet.  Grain was gradually introduced to the New Calves' diet; on average, after six to eight weeks, such calves would then be on a grain diet and they would be moved to a second barn - also on the Debtors' property - known as a "feeder barn".  Grain-fed calves generally remained in the feeder barn until they were 18 to 20 weeks old and weighed approximately 350 pounds ("Middling Calves"). I find that the Claimant agreed to purchase the Middling Calves from the Debtors at a purchase price which was periodically agreed to by the parties.  After the Claimant purchased the Middling Calves from the Debtors, it would ship them to western feed lots to raise them to a butchering weight, generally, 1200 to 1400 pounds each.  Hereafter, I shall refer to this

4

arrangement as the "First Agreement".

After August, 2005, I find that the Debtors and the Claimant entered into a second contractual arrangement. The Debtors then agreed to raise calves, which were owned by the Claimant, pursuant to the terms of several written Calf Feeding Contracts. The Debtors received a fee to feed a calf to a target weight of 350 pounds. Adjustments were made to the agreed to fee to compensate the Claimant for any calves which were not returned to it because of mortality or other cause. Similarly, the agreed to fee was adjusted upward or downward for each pound by which the weight of the subject calf was over or under the 350-pound target weight. I find that the arrangement between the parties based upon the series of Calf Feeding Contracts ended no later than January 2007. This arrangement shall hereinafter be referred to as the "Second Agreement".

After January 2007, the parties' business dealings evolved into a third arrangement. Under this agreement, the Debtors would continue to raise New Calves which were owned by the Claimant. However, under this arrangement, the Debtors were paid only for their labor in raising New Calves to the agreed to target weight. Under this arrangement, the Claimant paid a per head daily charge; it also agreed to pay for all other expenses, including feed and veterinary expenses. Hereinafter, I will refer to this as the "Third Agreement". I also find that the last cattle placed by the Claimant with the Debtors left their farm in May 2008.

After the parties had submitted their Briefs concerning Claim 11-2 and the Claim Objection, the U.S. Supreme Court decided the case of *Stern v. Marshall*, 131 S.Ct. 2594 (U.S. 2011). Because the Claim Objection included what was denominated a setoff or counterclaim, I asked the parties to submit briefs concerning the applicability of *Stern v. Marshall* to the case at

5

bar.  The parties submitted Briefs on this issue and, on March 15, 2012, I heard oral argument on this question.

The Claim Objection to Claim 11-2 is now ripe for decision.

## III.    DISCUSSION

### A.    Bankruptcy Court's Authority to Enter Final Judgment on the Claim Objection

*Stern v. Marshall*, 131 S.Ct. 2594 (U.S. 2011) considered the following question: Did Congress exceed its Constitutional authority when it gave the Bankruptcy Court, an Article I court, the ostensible authority to render final judgments on counterclaims - based on state law - against a claimant who filed a proof of claim in the bankruptcy case?  The Supreme Court ultimately answered this question in the affirmative; finding that the subject counterclaim would not necessarily be resolved in ruling on the subject proof of claim.

*Stern v. Marshall*, to say the least, has a convoluted procedural history.  I will attempt to offer a broad brush outline of that procedural history.  Vickie Marshall a/k/a Anna Nicole Smith ("Vickie"), filed a Chapter 11 bankruptcy in the Central District of California.  Prior to the bankruptcy filing, Vickie was briefly married to J. Howard Marshall, II ("J. Howard").

A little more than thirteen months after his marriage to Vickie, on August 4, 1995, J. Howard died.  J. Howard had made substantial gifts to Vickie during their courtship and marriage, but he did not include her in his will.  The ultimate beneficiary of J. Howard's estate plan was one of his sons, E. Pierce Marshall ("Pierce").  *Marshall v. Marshall*, 547 U.S. 293, 126 S.Ct. 1735, 1743 (U.S. 2006).  The *Marshall v. Marshall* decision recounts the initial litigation between Vickie and Pierce, both in the U.S. Bankruptcy Court and in a probate court in Harris County, Texas.  Suffice it to say, that Vickie's Chapter 11 was filed during ongoing

6

probate proceedings. After the Chapter 11 filing, Pierce filed a proof of claim in Vickie's

bankruptcy alleging that she had defamed him by alleging that he had engaged in "forgery, fraud,

and overreaching to gain control of his father's [J. Howard's] assets". *Marshall v. Marshall* at

1742. Vickie counterclaimed to Pierce's proof of claim alleging that he had tortiously interfered

with a gift she expected from J. Howard.

By the time *Stern v. Marshall* reached the U.S. Supreme Court, both Vickie and J.

Howard had died leaving the litigation field to the representatives of their decedents' estates.

*Stern v. Marshall*, 131 S.Ct. 2594, FN1 (U.S. 2011).

Chief Justice Roberts wrote the majority opinion in the 5-4 *Stern v. Marshall* decision.

The Supreme Court's description of the prior litigation includes:

> After J. Howard's death, Vickie filed a petition for bankruptcy in
> the Central District of California. Pierce filed a complaint in that
> bankruptcy proceeding, contending that Vickie had defamed him
> by inducing her lawyers to tell members of the press that he had
> engaged in fraud to gain control of his father's assets. The
> complaint sought a declaration that Pierce's defamation claim was
> not dischargeable in the bankruptcy proceedings. Pierce
> subsequently filed a proof of claim for the defamation action,
> meaning that he sought to recover damages for it from Vickie's
> bankruptcy estate. See § 501(a). Vickie responded to Pierce's
> initial complaint by asserting truth as a defense to the alleged
> defamation and by filing a counterclaim for tortious interference
> with the gift she expected from J. Howard. As she had in state
> court, Vickie alleged that Pierce had wrongfully prevented J.
> Howard from taking the legal steps necessary to provide her with
> half his property.
>
> On November 5, 1999, the Bankruptcy Court issued an order
> granting Vickie summary judgment on Pierce's claim for
> defamation. On September 27, 2000, after a bench trial, the
> Bankruptcy Court issued a judgment on Vickie's counterclaim in
> her favor. The court later awarded Vickie over $400 million in
> compensatory damages and $25 million in punitive damages.

7

*Stern v. Marshall* at 2601.

Pierce appealed from the Bankruptcy Court to the District Court. It appears that the District Court found that, while Vickie's counterclaim for tortious interference was within the literal language of the designation of certain bankruptcy proceedings as "core" (see 28 U.S.C. § 157(b)(2)(C)), it would be unconstitutional to hold that all counterclaims by a bankruptcy estate are core. The District Court treated the Bankruptcy Court's judgment as merely proposed findings and conclusions. After review, the District Court still found that Pierce had tortiously interfered with the expectancy from J. Howard and awarded Vickie compensatory and punitive damages each in the amount of $44,292,767.33. In the meantime, the Texas state court had conducted a jury trial on the merits of the parties' claims and entered a judgment in Pierce's favor. *Stern v. Marshall* at 2602.

Later, the Court of Appeals for the Ninth Circuit held that Vickie's counterclaim against Pierce "was a personal injury claim" and she could not defeat Pierce's right to a jury trial before an Article III Court ". . . by shoehorning it into bankruptcy filing". *In re Marshall*, 600 F.3d 1037, 1069 (9th Cir. 2010).

What did the U.S. Supreme Court decide in *Stern v. Marshall*, and how does it affect the Claim Objection to Claim 11-2? In my view, *Stern v. Marshall* represents the Supreme Court's most recent review of the jurisdictional scheme for bankruptcy courts established by Congress after the Bankruptcy Code was enacted on October 1, 1979.

The purpose of this Section of my Opinion is to determine whether I have the authority to enter a final judgment on the Claim Objection, which Objection included a section denominated as a "counterclaim". It is beyond the purview of this Opinion to offer a complete history of the

8

U.S. Supreme Court's prior decisions which have considered the appropriate division of powers between the Legislative and Judicial Branches as it relates to the authority of the U.S. Bankruptcy Court.

However, I think it is important to reference at least two prior Supreme Court decisions which considered the proper division of powers. First, *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858 (1982). In *Northern Pipeline*, the Chapter 11 debtor sued a creditor for damages from alleged breaches of contract and warranties. The Supreme Court noted that the claims of the debtor, Northern Pipeline, arose entirely under state law. It also noted the importance of allowing such claims to be adjudicated by an Article III judge conducting a jury trial. In *Northern Pipeline*, the Supreme Court emphasized the importance of the checks and balances among the three branches of government which the framers provided for in the Constitution. It noted that "[a]s an inseparable element of the constitutional system of checks and balances, and as a guarantee of judicial impartiality, Art. III both defines the power and protects the independence of the Judicial Branch". *Northern Pipeline*, *supra*, at 2865. The decision also stresses that Article III judges are vested with lifetime tenure and protection from salary diminution. Such protections are subject only to the "good behaviour" clause of Article III which provides that an Article III judge is subject to removal only by impeachment.

The Court in *Northern Pipeline* noted, "[i]t is undisputed that the bankruptcy judges whose offices were created by the Bankruptcy Act of 1978 do not enjoy the protections constitutionally afforded to Art. III judges". *Northern Pipeline*, *supra*, at 2866. The Supreme Court noted that bankruptcy judges are appointed for fourteen year terms and their salaries are

9

not immune from diminution by Congress.

*Northern Pipeline* notes that, historically, the right to a trial before an Article III judge had three exceptions: (1) territorial courts; (2) courts-martial; and, (3) legislative courts and administrative agencies adjudicating public rights cases. The first two exceptions appear relatively straightforward. The "public rights" exception is less easily defined. *Northern Pipeline* notes, "the distinction between public rights and private rights has not been definitively explained in our precedents". *Northern Pipeline* at 2870. The decision suggests that a matter of public rights concerns a dispute between the government and other parties. *Northern Pipeline* recognizes that matters of public rights may be delegated by Congress to non-Article III legislative courts or administrative agencies for determination. "Private-rights disputes, on the other hand, lie at the core of the historically recognized judicial power." *Northern Pipeline* at 2871. I understand private rights disputes to generally encompass the alleged liability of one individual or entity to another under applicable law.

The Supreme Court in *Northern Pipeline* ultimately held that Congress' broad grant of powers to bankruptcy judges, then codified at 28 U.S.C. § 1471, was unconstitutional in that it vested the essential attributes of the Article III District Court in a non-Article III adjunct, the Bankruptcy Court. *Northern Pipeline* was decided on June 28, 1992. The Supreme Court stayed its judgment until October 4, 1992. The Supreme Court appears to have been inviting Congress to enact a new bankruptcy jurisdictional statute which would comport with the Constitution's Article III requirements.

The second Supreme Court decision which I mention as a backdrop to *Stern v. Marshall*, is *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782 (1989). In *Granfinanciera*, a

Case 1:10-bk-02566-RNO    Doc 140    Filed 05/03/12    Entered 05/03/12 11:41:24    Desc
Main Document      Page 10 of 35

Chapter 11 trustee brought a fraudulent transfer action against several Columbian defendants. The defendants, who had not filed proofs of claim in the bankruptcy case, requested a jury trial on the fraudulent transfer claims.

*Granfinanciera* recognizes that the Constitution's Seventh Amendment right to a jury trial may not lie for claims of "public rights". The decision suggests that a public right need not always concern a dispute between the government and others. Like *Northern Pipeline*, *Granfinanciera* recognized that Congress may lawfully enact a statute which provides for the resolution of disputes concerning a comprehensive federal regulatory program by non-Article III forums. However:

> If a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court. If the right is legal in nature, then it carries with it the Seventh Amendment's guarantee of a jury trial.

*Granfinanciera* at 2797.

*Granfinanciera* held that a bankruptcy trustee's right to recover a fraudulent conveyance under the Bankruptcy Code is ". . . more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions". *Granfinanciera* at 2797. The Opinion also states, "[w]e do not suggest that the restructuring of debtor-creditor relations is in fact a public right". *Granfinanciera* at FN11.

The Supreme Court, in *Granfinanciera*, held that the Seventh Amendment entitled the defendants/petitioners to a jury trial on the fraudulent conveyance claims. It did not reach the question of whether or not the jury trial could be conducted by a non-Article III bankruptcy judge subject to District Court review pursuant to the 1984 Amendments to the bankruptcy

jurisdictional scheme.

What then is the outline of the bankruptcy jurisdictional scheme which the Supreme Court considered in *Granfinanciera* and, later, in *Stern v. Marshall*?  Bankruptcy judges are currently appointed for fourteen year terms by the Court of Appeals for the Federal Circuit in which they sit.  28 U.S.C. § 152(a).  Bankruptcy judges still do not enjoy lifetime tenure, nor do they enjoy protection from salary diminution.

The statutory bases for Bankruptcy Court jurisdiction are set forth in 28 U.S.C. § 1334 (1984) and 28 U.S.C. § 157 (1984).  Initially, the District Court has exclusive jurisdiction over all civil proceedings arising under the Bankruptcy Code, or arising in or related to cases under the Bankruptcy Code.  28 U.S.C. § 157(a) provides that bankruptcy cases shall be referred to the bankruptcy judges in the respective district.  Bankruptcy judges may make final determinations in cases under Title 11.  The statute also gives bankruptcy judges the authority to make final decisions concerning "core proceedings" which arise in a bankruptcy case.  Illustrative examples of core proceedings are provided in the statute.  28 U.S.C. § 157(b)(2).  Included among the enumerated core proceedings are "counterclaims by the estate against persons filing claims against the estate".  28 U.S.C. § 157(b)(2)(C).

The legislative bankruptcy scheme gives a bankruptcy judge lesser authority concerning a non-core proceeding that is related to a bankruptcy case.  In such matters, the bankruptcy judge submits proposed findings of fact and conclusions of law to the District Court.  The district judge makes a de novo review of the bankruptcy judge's proposed findings and conclusions and the District Court is to enter the final judgment concerning the non-core proceeding.  28 U.S.C. § 157(c)(1).  The statute further provides that, with the consent of all the parties to the

12

proceeding, the District Court may refer a non-core, related to case to the bankruptcy judge to make a final judgment. 28 U.S.C. § 157(c)(2). Further, the statute provides that the District Court may withdraw the reference of a matter from the Bankruptcy Court, either on its own motion or on timely motion of any party. 28 U.S.C. § 157(d).

Considerable jurisprudence has developed concerning the distinction among matters which arise under the Bankruptcy Code, those that arise in bankruptcy cases, and those that are related to bankruptcy cases:

> A case "arises under" title 11 if it invokes a substantive right provided by title 11. . . . The category of proceedings "arising in" bankruptcy cases includes such things as administrative matters, orders to turn over property of the estate and determinations of the validity, extent, or priority of liens. Proceeding "arise in" a bankruptcy case, if they have no existence outside of the bankruptcy. Finally, a proceeding is "related to" a bankruptcy case if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.

*Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006) (internal quotations and citations omitted). Also see, *In re Guild and Gallery Plus, Inc.*, 72 F.3d 1171, 1178 (3d Cir. 1996); *Browning v. Levy*, 283 F.3d 761, 773 (6th Cir. 2002).

Thus, in 1984, Congress gave Article I bankruptcy judges the power to enter final judgments concerning matters which arise under the Bankruptcy Code and to finally decide core proceedings including, but not limited to, those listed in 28 U.S.C. § 157(b)(2). Congress vested more limited authority in bankruptcy judges concerning non-core proceedings which are related to a bankruptcy case. In such instances, absent consent of all of the parties, the bankruptcy judge may only issue proposed findings and conclusions which are subject to de novo review by the District Court.

13

I have tried to offer a brief historical and legislative backdrop to the *Stern v. Marshall* decision. I now return to the question of what *Stern v. Marshall* held and how it affects my authority to decide the Claim Objection to Claim 11-2.

*Stern v. Marshall* held that allowing the Bankruptcy Court to enter a final judgment on Vickie's counterclaim against Pierce violated Article III of the Constitution. It did so on the basis that the subject counterclaim was based upon state law claims which concerned private rights. The Supreme Court recognized that Vickie's counterclaim against Pierce for tortious interference was a specified "core proceeding" under 28 U.S.C. § 157(b)(2)(C). The Supreme Court noted that "Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty". *Stern v. Marshall*, 131 S.Ct. at 2609, citing *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272, 284, 15 L.Ed 372 (1856).

The Supreme Court in *Stern v. Marshall* noted that after *Northern Pipeline*, Congress amended the statutes governing bankruptcy jurisdiction and bankruptcy judges. It noted that the 1984 legislation provided that bankruptcy judges would be appointed by the Courts of Appeal for the circuits in which their districts are located. 28 U.S.C. § 152(a). It rejected Vickie's argument that the Bankruptcy Court's entry of a final judgment on the state common law counterclaim was constitutional.

The Supreme Court in *Stern v. Marshall* stressed:

> Here Vickie's claim is a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy. *Northern Pipeline* and our subsequent decision in *Granfinanciera*, rejected the application of the "public rights" exception in such cases.

14

*Stern v. Marshall* at 2611.  The ultimate holding of *Stern v. Marshall* is:

> Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article.  We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984.  The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.

*Stern v. Marshall* at 2620.

Under *Stern v. Marshall*, do I have the authority to render a final judgment on the Claim Objection, which included the paragraph 11 "counterclaim"?  I answer this question in the affirmative because I conclude that the defensive counterclaim which was plead is necessarily resolved by ruling on the allowability of Claim 11-2.

In this case, the "counterclaim" itself was included in paragraph 11 of the Claim Objection; it sought to reduce the amount that the Debtors owed to the Claimant.  I contrast this to the situation where the bankruptcy estate is seeking affirmative monetary relief from a claimant to augment the bankruptcy estate.  That was the case in *Stern*.

Further, in the case at bar, the only basis for the purported counterclaim is the course of business dealings between the Claimant and the Debtors.  It is true that the terms of the parties' agreements evolved through the course of the First Agreement, the Second Agreement, and the Third Agreement.  However, there is a common nucleus of law and fact in resolving the allowability of Claim 11-2 and in considering the Debtors' counterclaim which merely seeks to reduce the amount owed by the Debtors to the Claimant.  I distinguish the instant situation from the case presented in *Stern* where there were substantially different predicate facts and legal bases in considering the allowance of Pierce Marshall's defamation claim against the Marshall

15

bankruptcy estate and that estate's counterclaim for alleged tortious interference.

Numerous other bankruptcy courts have noted the narrowness of the holding in *Stern v. Marshall*. It has been noted, "[t]he opinion did not hold 28 U.S.C. § 157(b)(2)(C) to be facially unconstitutional. Rather, the court limited the holding to the debtor's counterclaim and others substantially like it - namely, state law counterclaims that are not resolved in the process of ruling on a creditor's proof of claim." *In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 698 (Bankr. N.D.Ill. 2011); *In re Black, Davis and Shue Agency, Inc.*, 2012 WL 360062, *11-12 (Bankr. M.D.Pa. 2012). Similarly, Bankruptcy Judge Morris in the Southern District of New York has noted:

> Nowhere in *Marathon*, *Granfinanciera* or *Stern* does the Supreme Court rule that the bankruptcy court may not rule with respect to state law when determining a proof of claim in the bankruptcy, or when deciding a matter directly and conclusively related to the bankruptcy. As noted, *Stern* repeatedly emphasizes that it addresses only the constitutionality of the bankruptcy court making a final ruling on a state-law counterclaim that would not be finally resolved in the process of allowing or disallowing a proof of claim.

*In re Salander O'Reilly Gallaries*, 453 B.R. 106, 117 (Bankr. S.D.N.Y. 2011).

In this case, resolution of Claim 11-2 and resolution of the counterclaim both require me to determine the nature of the contractual arrangements between the Claimant and the Debtors, then to determine the extent of the parties' performances under the contracts. Pennsylvania state law will provide the underlying basis for determination of the parties' agreement. It will also supply the basis for determining the existence of any breach of contract and the measure of damages for any breach. I conclude that Claim 11-2 and the defensively interposed counterclaim in this case are inextricably intertwined both factually and legally. Resolution of the counterclaim is necessarily implicated in ruling on the allowability of Claim 11-2.

16

The procedural posture of this case has simplified the determination that resolution of the counterclaim is necessarily implicated in ruling on the Proof of Claim. As noted above, *Stern v. Marshall* was not decided until after the record in this case had been closed and the parties had submitted their initial post-hearing briefs. Thus, I had a complete record to review in making my determination concerning the application of *Stern* here.

Here, both the Claimant and the Debtors have consented to my entering final judgments concerning the counterclaim to Claim 11-2.[2] I will proceed to consider Claim 11-2 and the Claim Objection thereto, including the counterclaim.

### B.     Claim Objection and Burden of Proof

Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 3001(f) provides:

> (f)     *Evidentiary effect*
> A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.

The Third Circuit had occasion to discuss the shifting burden of proof concerning proofs of claims and objections thereto. It noted that:

> Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is "*prima facie*" valid. In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to *prima facie* case. In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of

_____

          [2]          Scarff Bros., Inc.'s Supplemental Br. Regarding the Application of *Stern v. Marshall* 10; Debtors' Supplemental Br. Regarding the Application of *Stern v. Marshall* 4.

the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. The burden of persuasion is always on the claimant.

*In re Allegheny Intern., Inc.*, 954 F.2d 167, 173-174 (3d Cir. 1992) (internal citations omitted); also see, *In re Stauder*, 396 B.R. 609, 610-611 (Bankr. M.D.Pa. 2008).

Further, if the proof of claim is executed and filed in accordance with F.R.B.P. 3001, subpart (f) of the Rule provides that the claim constitutes *prima facie* evidence of the validity and the amount of the claim. This evidentiary presumption remains in force even after an objection to the claim is filed. *In re Sacko*, 394 B.R. 90, 98 (Bankr. E.D.Pa. 2008); *In re Kincaid*, 388 B.R. 610, 613 (Bankr. E.D.Pa. 2008).

A creditor's claims in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying contrary provisions of the Bankruptcy Code. *Butner v. U.S.*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The Supreme Court has also noted that "[t]he 'basic federal rule' in bankruptcy is that state law governs the substance of claims. Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law'". *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20, 120 S.Ct. 1951, 1955 (U.S. 2000); also see *Travelers Cas. & Sur. Co. of America v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 127 S.Ct. 1199, 1201 (U.S. 2007).

The allowance of claims in bankruptcy is governed by 11 U.S.C. § 502.[3] It provides, in part: "(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, . . . objects." To determine what claims are enforceable

---

[3] Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37 ("BAPCPA").

18

against the bankruptcy estate, § 502 looks to non-bankruptcy law. *In re Combustion Engineering, Inc.*, 391 F.3d 190, 245 FN66 (3d Cir. 2004); *In re G-I Holdings, Inc.*, 443 B.R. 645, 663 (Bankr. D.N.J. 2010).

Thus, I will examine Claim 11-2 to determine whether it complies with F.R.B.P. 3001 and is, therefore, entitled to the *prima facie* validity provided by F.R.B.P. 3001(f). If *prima facie* evidence of the validity and the amount of the claim is established, I will determine whether the Debtors have met their burden in overcoming the presumption of allowability and offering sufficient proof that the claim is invalid. I will apply the basic federal rule in bankruptcy that state law governs the substance of claims. I will, therefore, apply Pennsylvania law to evaluate Claim 11-2 and the Debtors' objections thereto. *In re Lampe*, 665 F.3d 506, 515 (3d Cir. 2011); also see, *In re Armstrong World Industries, Inc.*, 348 B.R. 111, 123 (D.Del. 2006).

Thus, if *prima facie* validity has been established, the burden will shift to the Debtors to produce evidence sufficient to refute at least one of the allegations that is essential to Claim 11-2's legal sufficiency. If the Debtors produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the Claimant to prove the validity of the claim by a preponderance of the evidence. *In re Sacko*, 394 B.R. 90, 97 (Bankr. E.D.Pa. 2008); *In re Allegheny Intern., Inc.*, 954 F.2d 167, 173-174 (3d Cir. 1992).

## C. Presumption of Allowability

I have reviewed Claim 11-2.

The claim consists of the one-page Official Form B10; all of the required information is completed, including the amount of the claim, $878,249.11. Box 4 on the Official Form is completed indicating that it is a secured claim, secured by "3 parcels of real estate and cattle", an

19

asserted collateral value of $2,200,000.00. Claim 11-2 indicates the basis for perfection as "Mortgage/UCC-1".

Claim 11-2 has seven exhibits consisting of: (1) a one-page itemization of claim; (2) a Third Amended and Restated Revolving Variable Rate Note dated March 11, 2005, from the Debtor, Thomas H. McElwee, Jr., to the Claimant in the face amount of $750,000.00; (3) a Third Amended and Restated Guaranty Agreement from the Debtor, Becky S. McElwee, as Guarantor, to the Claimant; (4) an Open-End Mortgage, Security Agreement and Fixture Filing as recorded in the Office of the Recorder of Deeds of Cumberland County, Pennsylvania, dated March 11, 2005, from the Debtors to the Claimant; (5) an Open-End Mortgage, Security Agreement and Fixture Filing as recorded in the Office of the Recorder of Deeds of Franklin County, Pennsylvania, dated March 11, 2005, from the Debtors to the Claimant; (6) a Second Amended and Restated Security Agreement dated March 11, 2005, from the Debtor, Thomas H. McElwee, Jr., to the Claimant; and, (7) a copy of a UCC-1 Financing Statement filed with the Secretary of the Commonwealth of Pennsylvania naming the Debtor as Thomas H. McElwee, Jr. filed on November 23, 2009. Claim 11-2, including its seven exhibits, was admitted into evidence during the hearing. No objections were interposed as to the authenticity of the Official Form B10 or any of the attendant exhibits.

After review of Claim 11-2, including the exhibits thereto, I find that the subject Proof of Claim was filed in accordance with the requirements of F.R.B.P. 3001(a). Therefore, Claim 11-2 constitutes *prima facie* evidence of the validity and the amount of the claim by the Claimant. F.R.B.P. 3001(f); *In re Lampe*, 665 F.3d 506, 514 (3d Cir. 2011); *In re American Home Mortg. Holdings, Inc.*, 637 F.3d 246, 256 (3d Cir. 2011); *In re Smith*, 463 B.R. 756, 766 (Bankr. E.D.Pa.

20

2012).

**D. Evidence Refuting the Claim**

The Claim Objection was filed to Docket Number 61. The Claim Objection was not filed in numbered paragraph form, and this makes summarization of the objections more difficult. Essentially, the Claim Objection states seven objections as follows:

1. That Claim 11-2 is not fully secured;

2. That Claim 11-2 improperly includes a default rate of interest;

3. That the Claimant breached the terms of the various agreements between the parties;

4. That the Claimant provided the Debtors with cattle which were "unhealthy and in poor condition" and that the Claimant failed to pay the Debtors the "fair and standard market price for all cattle at the time of sale"[4];

5. That the Claimant failed to pay all of the veterinary, feed, and other necessary costs and expenses associated with cattle which the Claimant placed with the Debtors;

6. That the Claimant acted in bad faith;

7. That the Debtors "are entitled to a setoff, or, alternatively, hold a counterclaim against Scarff Brothers, for any sums remaining due and owing Scarff Brothers . . ."[5]

**1. The Claim is not fully secured.**

The first objection, that Claim 11-2 may not fully be secured, is easily disposed of. First, I note that this is a claim objection and not a proceeding under § 506 of the Bankruptcy Code to determine secured status. In any event, on June 6, 2011, I rendered a decision which determined

---

[4] Objections to All Scarff Brothers, Inc. Proofs of Claim, Including Claim Nos. 11-1 and 11-2 4 ¶ 5.

[5] Objections to All Scarff Brothers, Inc. Proofs of Claim, Including Claim Nos. 11-1 and 11-2 6 ¶ 11.

21

the fair market values of the Debtors' three real properties. The decision, *In re McElwee*, is reported at 449 B.R. 669 (Bankr. M.D.Pa. 2011). Under the doctrine of judicial restraint, I will not, at this time, determine the extent of the Claimant's secured claim. I overrule that portion of the Claim Objection.

**2.      The Claim improperly includes a default interest rate.**

Claim 11-2 clearly included a default interest rate in the itemization of its claim. The second page of Claim 11-2 includes the following entry:

> (c)      Accrued interest from 3/16/08 to 3/30/10      $153,461.02
>           at contractual default rate of WSJ Prime
>           plus 7% (Current *per diem* is $202.29)

The note dated March 11, 2005, in the face amount of $750,000.00, does make provision for a default rate of interest. A "default interest rate" is defined on page one of the note. Further, page five of the note provided, in part, "[u]pon the occurrence of an Event of Default, interest shall accrue thereafter at the Default Interest Rate, . . .".

It is noted that allowing the default of interest will allow the Claimant to recover pre-petition interest at a rate which is five percent higher than the contract interest rate stated in the note. Both the default interest rate and the contract interest rate are monthly adjustable rates and are based upon the Wall Street Journal published prime rate of interest.

Debtors' Brief in support of the Claim Objections includes the following:

> Given the significant evidence proving Scarff Brothers' lack of good faith and fair dealings throughout this entire case, it must be concluded that Scarff Brothers is not entitled to any default rate of interest on the outstanding balance of the Scarff Brothers' claim, whatever the Court may determine that outstanding balance to be.

Debtors' Br. on Objections to Scarff Brothers' Proof of Claim 22. The Debtors have not cited

22

any statutory or case law to support their argument that the default rate of interest should not

apply.

I have considered other bankruptcy court decisions which analyze the propriety of a post-

petition default interest rate when sought by an oversecured creditor.  For example, *In re La*

*Guardia Associates, LP*, noted:

> At least 3 distinct rules have been applied by courts in dealing with
> post-bankruptcy default rate interest claims by oversecured
> creditors.  One line of authority holds that the only limitation on
> the oversecured creditor's right to default rate interest is the
> enforceability of such right under applicable non-bankruptcy law.
>
> A second line of authority takes the position that a claim for
> default rate interest is not a claim for interest at all, but rather a
> claim for a "charge", which, as noted above, must be reasonable
> under § 506(b).
>
> . . . A third line of authority reasons that the Bankruptcy Code has
> the equitable power and duty to examine the circumstances of the
> oversecured creditor in each particular case and consider notions
> of fairness and equity in determining whether to award default rate
> interest.  This appears to be the majority view.

*In re La Guardia Associates, LP*, 2006 WL 6601650, *38 (Bankr. E.D.Pa. 2006) (internal

citations omitted); also see *In re 400 Walnut Associates, L.P.*, 461 B.R. 308, 317 (Bankr. E.D.Pa.

2011).

Some courts have found that there is a rebuttable presumption in favor of allowing the

contract default interest rate post-petition.  The presumption may be rebutted based upon

equitable considerations of the specific facts of a case.  *Matter of Terry Ltd. Partnership*, 27 F.3d

241, 243 (7th Cir. 1994).

I find the above authority readily distinguishable from the case at bar.  First, the Claimant

is seeking the default rate of interest only to the petition date, March 30, 2010.  Second, no

record was established concerning market rates of interest or other factors which are normally considered in challenges to post-petition claims for a default rate of interest. Finally, I have not found the Claimant's relevant conduct to fall below a good faith standard. Therefore, I overrule the Claim Objection to the extent it challenged the application of the pre-petition default interest rate.

### 3.     The Claimant breached its contract with the Debtors.

Generally, in Pennsylvania, certain material facts must be plead to allege a breach of contract. There are three essential elements - there was a contract, the defendant breached it, and the plaintiffs suffered damages from the breach. *McShea v. City of Philadelphia*, 606 Pa. 88, 995 A.2d 334, 340 (Pa. 2010); *Hart v. Arnold*, 884 A.2d 316, 332 (Pa.Super. 2005).

As part of the Claim Objection, the Debtors maintain that the Claimant agreed to pay the "market price" for the Middling Calves which the Claimant purchased from the Debtors pursuant to the First Agreement. The Claimant's representatives vigorously disputed this allegation. My resolution of this issue is largely based upon my review of the record and the credibility of the witnesses.

I noted above the disadvantages in parties conducting business based upon verbal agreements. However, I appreciate that there can be advantages to a verbal arrangement. Here, the Debtors retained the freedom to sell their Middling Calves to third parties if they felt that the Claimant's purchase price was insufficient. The Claimant, as a potential purchaser, would have the same freedom if it felt that the Debtors' price was too high. Pennsylvania courts, historically, have recognized freedom of contract. *De Lage Landen Financial Services, Inc. v. M.B. Management Co., Inc.*, 888 A.2d 895, 900-901 (Pa.Super. 2005) (under the Pennsylvania

24

Uniform Commercial Code, parties still enjoyed freedom of contract concerning agreed to terms); *Karkaria v. Karkaria*, 592 A.2d 64, 70 (Pa.Super. 1991) (the legislature and the trial court give due deference to the parties' freedom to contract); *Pennsylvania State Camp Patriotic Order Sons of America v. Washington Camp No. 135, Patriotic Order Sons of America*, 123 A.2d 701, 704-705 (Pa. 1956) (absent an impingement on public policy, the principle of freedom of contract allows for the enforcement of the terms of parties' agreement).

I note that the Claimant's representatives and the Debtor, Thomas McElwee, each had significant prior experience in the purchase and sale of cattle before they entered into the First Agreement. I also find that the First Agreement, the Second Agreement, and the Third Agreement were all voluntary agreements and were perceived by each party to be of mutual benefit. Both parties sought to gain by each transaction. The Claimant sought to secure a stable source of Middling Calves for its western feed lot operation. Another of the Claimant's objectives was to be able to purchase Middling Calves at a pre-determined price, thus serving as a hedge against potential price increases in the open cattle market. I conclude that the Debtors sought the advantage of having a known, ready, and willing purchaser for the Middling Calves they raised. Further, having an agreed to price for the sale of Middling Calves would serve to hedge the Debtors against significant price decreases in the open cattle market.

I conclude that the Debtors have not met their burden to show the Claimant agreed to purchase the Middling Calves for the "market price" or "market rate". I do not find it credible that the Claimant, whose principals are experienced cattlemen, would extend a $750,000.00 credit facility to the Debtors and enter into all of the attendant arrangements only to be able to purchase calves for the same price at which they could purchase them on the open cattle market.

25

I find that there was an initial base price that the Claimant agreed to pay the Debtors per Middling Calf during the First Agreement. The base price was adjusted, from time to time, based upon the parties' subsequent oral agreements. There was an offer and acceptance each time a calf was sold and purchased and each party performed their obligations under the First Agreement. I conclude that the Debtors have not proven a breach of contract concerning the First Agreement under applicable Pennsylvania law.

The Debtors also asserted that during the time periods covered by the Second Agreement and the Third Agreement, the Claimant provided them with unhealthy cattle which caused disease to their herd with attendant damages.

At hearing, the Debtors presented the testimony of two veterinarians, Dr. Jeffrey Pyle and Dr. Trent Lartz. Both veterinarians testified that they had treated the Debtors' cattle for a period of time. Dr. Pyle from June 2004, until December 2005; Dr. Lartz from September 2006, to April 2007.

Dr. Pyle testified that while he was treating the Debtors' cattle, the amount of antibiotics they were purchasing increased significantly. He also testified that such antibiotics were primarily used for treating pneumonia or other respiratory disease in cattle. In response to several hypothetical questions, Dr. Pyle opined that introduction of diseased cattle into a herd would be the primary way to introduce respiratory disease into the cattle herd. However, I do not find that Dr. Pyle linked any of the respiratory disease suffered by the Debtors' cattle to the Claimant - either by its actions or inactions.

Dr. Lartz's testimony included his observations, like Dr. Pyle's, that the Debtors' facilities were generally very adequate for raising feeder calves. He also testified that he

26

performed approximately six to twelve necropsies on dead animals from the Debtors' herd.  His

findings included that the animals had minimal internal fat, and lung lesions that ". . . showed

chronicity, meaning that they had been sick for a while".  Trial tr. vol. 3, 42:10, Feb. 24, 2011.

Dr. Lartz also testified that the Debtors' herd experienced an exceedingly high mortality rate.

Like Dr. Pyle, Dr. Lartz testified that the most likely cause of disease in the herd was the

introduction of other diseased animals.

Dr. Lartz testified that Mr. McElwee told him that weaker or "culled" calves were being

brought in from other farms.  Dr. Lartz testified that he told Mr. McElwee that this practice

needed to be stopped, if at all possible.  The record does not show any concrete action by the

Debtors to change their practice of accepting cattle.  I find that Dr. Lartz's testimony did not

establish that the increased disease and mortality suffered by the Debtors' herd was caused by

the actions or inactions of the Claimant.

Mrs. McElwee also testified in the course of the hearings.  In her testimony, twenty-eight

photographs were introduced into evidence.  Generally, the photographs depicted dead or

apparently diseased cattle; the photographs contained time stamps between September 2, 2006,

and January 29, 2008.  Some of the cattle shown are obviously dead; others show hair loss, a

potential sign of ill health.

Mrs. McElwee, like her husband, attempted to link the increased mortality in their herd to

cattle brought to their facility by the Claimant.  I will say that, on a personal level, I sympathize

with the Debtors about the loss of cattle which they suffered.  However, I must decide this case,

free of emotion, based upon the proven facts and applicable law.

I find that the Debtors did not show by a preponderance of the evidence that the actions

or inactions of the Claimant contributed to the increased disease and mortality suffered by their herd. An allegation of damages alone is not sufficient to support a breach of contract claim. Generally, three elements must be proven to support a breach of contract claim: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and, (3) resultant damages. *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa.Super. 1999); *Cargill-Alliant, LLC v. GPU Service, Inc.*, 2001 WL 118967, *7 (E.D.Pa. 2001).

I find that the arrangements between the Claimant and the Debtors was not a long-term contract of adhesion. "An adhesion contract is defined as a standard form contract prepared by one party, to be signed by the party in the weaker position, (usually) a consumer, who has little choice about the terms." *In re Frascella Enterprises, Inc.*, 349 B.R. 421, 429 (Bankr. E.D.Pa. 2006) (internal citations omitted); *Huegel v. Mifflin Const. Co., Inc.*, 796 A.2d 350, 357 (Pa.Super. 2002). I find that the contractual arrangements between the Claimant and the Debtors were commercial transactions. This is consistent with § 101(8) of the Bankruptcy Code which provides that a consumer debt is a debt which is primarily incurred for a personal, family, or household purpose. Further, a consumer debt is distinguished from a business debt, the latter of which is incurred with a profit motive. *In Liegey*, 2009 WL 3817902, *3, (Bankr. M.D.Pa. 2009); *In re Runski*, 102 F.3d 744, 747 (4th Cir. 1996). I find that the Debtors' transactions with the Claimant were motivated by the pursuit of profit.

This is not a case where the Debtors have alleged a breach of express or implied warranties concerning calves which they purchased. Further, the record is devoid of corroborating evidence that the Debtors unsuccessfully attempted to reject any of the calves which were brought to their facility. No written correspondence to the Claimant to that effect

was introduced nor did any third party testify to either of the Debtors orally rejecting calves provided to them by the Claimant. I find that the Debtors never rejected, as non-conforming, any of the calves provided to them by the Claimant. The Debtors suggested that the Claimant introduced diseased calves which sickened their herd and increased their veterinary expenses. The Claimant's representative suggested that the Debtors were purchasing inferior calves which were not suitable for the feeding program. I reiterate my finding that the Debtors failed to prove a breach of contract by a preponderance of the evidence.

In Section D.6, infra, I concluded that an obligation of good faith was implied in the parties' Agreements. I also indicated in that Section that I would address here whether the Claimant breached this implied obligation.

Pennsylvania state courts have described the implied obligation of good faith and the doctrine of necessary implication in essentially the same terms. The Pennsylvania Superior Court thus described the doctrine of necessary implication:

> In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the party's right to receive the fruits of the contract.

*Palmieri v. Partridge*, 853 A.2d 1076, 1079 (Pa.Super. 2004) (internal citations omitted).

More recently, the Pennsylvania Superior Court indicated, "[b]oth the implied covenant of good faith and the doctrine of necessary implication are principles for courts to harmonize the reasonable expectations of the parties with the intent of the contractors and the terms in their contract." *Stamerro v. Stamerro*, 889 A.2d 1251, 1259 (Pa.Super. 2005). The *Stamerro* court also noted that these implied duties cannot override the express provisions of the parties'

29

contract.

      As with many subjective standards, it is difficult to catalog what conduct constitutes a lack of good faith in a contractual context. A complete catalog of the types of bad faith is impossible, but certain strains of bad faith include: ". . . evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Stamerro*, at 1259; *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa.Super. 1992).

      I agree that the implied covenant of good faith is analogous to what the Pennsylvania courts refer to as the doctrine of necessary implication. A contracting party is impliedly obligated to do what is required to implement the purposes of a contract - he is also obligated to refrain from actions that would injure the other party's rights to receive the fruits of the contract. For example, the Pennsylvania Superior Court held that a shopping center lessee may have violated the doctrine where it paid its rent to the lessor, but failed to occupy the leased premises. *Slater v. Pearle Vision Center, Inc.*, 546 A.2d 676, 679-680 (Pa.Super. 1988) (reversing allowance of preliminary objections).

      I have acknowledged that the Debtors suffered losses from their herd. However, I do not find that the Claimant's conduct failed to meet the good faith standard. My review of the record shows that the Claimant endeavored to discharge its contractual obligations while exercising due regard to the Debtors' contractual rights. I find it significant that when the First Agreement failed, the Claimant continued to bargain with the Debtors to see if their contractual goals could be accomplished under different terms. This gave rise to the Second and, in turn, the Third Agreements.

30

I conclude that the Claimant did not breach its implied duty to perform in good faith.  I also conclude that the Claimant did not violate the doctrine of necessary implication.

**4.      The Claimant provided cattle which were unhealthy and failed to pay the fair and standard price for cattle at the time of sale.**

This portion of the Claim Objection was addressed in Section D.3.

**5.      The Claimant failed to pay all the veterinary, feed and other necessary costs and expenses.**

Much of this portion of the Claim Objection is also subsumed in Section D.3.  The documentary evidence and testimony which the Claimant submitted on this allegation was credible and complete.  The Debtors' allegation was not substantiated by credible testimony or documentary proof.  The Debtors did not introduce into evidence any veterinary or feed bills.  I overrule this portion of the Claim Objection.

**6.      The Claimant acted in bad faith.**

For some time now, the courts of Pennsylvania have struggled with the issue of whether every contract includes an implied covenant of good faith and fair dealing.  The Pennsylvania Supreme Court's decision in *Ash v. Continental Ins. Co.*, 593 Pa. 523, 932 A.2d 877, 883 (Pa. 2007) illustrates this uncertainty.  The Court noted, "despite the apparent conflict over the applicability of the implied duty of good faith, we decline to engage in a discussion of this issue as it is not presently before us."  Additionally, footnote two in *Ash* notes that there is some disagreement in Pennsylvania's intermediate appellate courts.  Some of them have found a general implied duty of good faith and fair dealing in every contract.  Others have held the covenant of good faith is recognized only in limited situations (e.g., franchise agreements and insurance contracts).

Where there is no binding state court precedent on an issue, it is the responsibility of a federal court to predict how it believes the highest state court would rule on a particular issue. *In re Ressler Hardwoods and Flooring, Inc.*, 427 B.R. 312, 324 (Bankr. M.D.Pa. 2010); *In re SemCrude, L.P.*, 407 B.R. 82, 96 (Bankr. D.Del. 2009); *Borman v. Raymark Industries, Inc.*, 960 F.2d 327, 331 (3d Cir. 1992).

Generally, if the state's highest court has not clearly ruled on a matter, a federal court may rely on the decisions of intermediate state courts, unless the federal court is convinced that the highest state court would decide the issue differently. *Leonard v. Dorsey & Whitney, LLP*, 553 F.3d 609, 612 (8th Cir. 2009); *Fidelity Union Trust Co. v. Field*, 61 S.Ct. 176, 177-178 (U.S. 1940).

I find myself in agreement with two recent federal district court cases which predicted that the Pennsylvania Supreme Court would adopt § 205 of the Restatement (Second) of Contracts and find that every contract imposes on each party a duty of good faith and fair dealing in performance and enforcement. District Judge Pollack so held in *Kamco Indus. Sales, Inc. v. Lovejoy, Inc.*, 779 F.Supp.2d 416, 425 (E.D.Pa. 2011). The *Kamco* court held "[t]his court agrees that the Pennsylvania Supreme Court would adopt Section 205 of the Restatement if squarely confronted with the question."

*Zaloga v. Provident Life and Acc. Ins. Co. of America*, 671 F.Supp.2d 623 (M.D.Pa. 2009) also predicts Pennsylvania law on the issue of an implied covenant of good faith in every contract. The *Zaloga* court reviewed historical Pennsylvania precedents and held ". . . that the Supreme Court of Pennsylvania would adopt § 205 - and impart a contractual obligation of good faith and fair dealing to all contracts - if it were squarely presented with the issue." *Zaloga*,

32

supra at 629-630.

I join the *Kamco* and *Zaloga* courts in predicting that, given the occasion, the Supreme Court of Pennsylvania would adopt the Restatement (Second) of Contracts § 205. I believe this holding is consistent with Pennsylvania's adoption of numerous other sections of the Restatement (Second) of Contracts. *Middletown Tp. v. Unemployment Compensation Bd. of Review*, 40 A.3d 217, *10 (Pa.Cmwlth. 2012) (applying Restatement Contracts (Second) § 39(1)); *TruServ Corp. v. Morgan's Tool & Supply Co., Inc.*, 39 A.3d 253, 261 (Pa. 2012) (citing Restatement (Second) Contracts § 354); *Guerra v. Redevelopment Authority of City of Philadelphia*, 27 A.3d 1284, 1293 (Pa.Super. 2011) (citing Restatement (Second) Contracts § 90).

Further, this prediction of the law is consistent with the requirement that I give due deference to the decisions of Pennsylvania's intermediate appellate courts. *Rolick v. Collins Pine Co.*, 925 F.2d 661, 664 (3d Cir. 1991).

I have determined that the Pennsylvania courts would imply a covenant of good faith and fair dealing in the contractual arrangements between the Debtors and the Claimant. I must now consider whether the Claim Objection has stated a cause of action for a breach of this covenant. As noted above, the Pennsylvania courts have long implied the covenant of good faith and fair dealing to insurance contracts. The Pennsylvania Supreme Court has noted, "[w]e believe that this recent case law, employing contractual terms for the obligation of the insurer to represent in good faith the rights of the insured, indicates that a breach of such an obligation constitute a breach of the insurance contract for which an action in assumpsit will lie." *Gray v. Nationwide Mut. Ins. Co.*, 223 A.2d 8, 11 (Pa. 1966).

33

I conclude that if the Claimant breached any covenant of good faith to the Debtors, it did so in the context of their contractual dealings. I, therefore, considered the alleged violation of the implied covenant in Section D.3, supra, concerning the Debtors' allegations that the Claimant breached its agreements with them. However, I note there is no independent cause of action for a breach of the covenant of good faith and fair dealing arising in contracts in Pennsylvania. *Zaloga* at 631. I find that any cause of action for alleged breach of the implied covenant of good faith and fair dealing is merged into the breach of contract claims. *Eyer v. Cuna Mut. Group*, 2007 WL 2907276, *14 (W.D.Pa. 2007).

       **7.**       **The Debtors are entitled to a setoff or counterclaim against the Claimant.**

I have already concluded that the Debtors have failed to adduce proof that the Claimant breached any of its express or implied obligations to them. Therefore, I grant judgment on the counterclaim in favor of the Claimant and against the Debtors.

**IV.**    **CONCLUSION**

In summary, I find that the Debtors failed to prove cognizable damages under the First, Second, or Third Agreements. I also find that the Debtors failed to produce sufficient evidence to refute any of the allegations of Claim 11-2 which are essential to its legal sufficiency.

I find that the prima facie validity of Claim 11-2 has not been overcome. I, therefore, overrule the Claim Objection and allow Claim 11-2 as filed in the following amounts:

34

|     |                                      |               |
| --- | ------------------------------------ | ------------- |
| a.  | unpaid principal balance             | $710,467.70   |
| b.  | accrued interest through 3/15/08     |               |
|     | at WSJ Prime plus 2%                 | $   6,937.04  |
| c.  | accrued interest from 3/16/08 to     |               |
|     | 3/30/10 at contractual default rate  |               |
|     | of WSJ Prime plus 7%                 | $153,461.02   |
|     | (LESS) interest paid                 | ($36,326.39)  |
| d.  | late charges                         | $   1,888.35  |
| e.  | attorneys' commission                |               |
|     | (5% as authorized)                   | $  41,821.39  |
|     | **TOTAL**                            | $878,249.11   |

An Order will be entered consistent with this Opinion.

By the Court,

Date: May 3, 2012

_____

Robert N. Opel, II, Bankruptcy Judge

(BI)

35